**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EMPIRE INDUSTRIES INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 698** |
| | ) | |
| **WINSLYN INDUSTRIES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Empire Industries Inc. (Empire) contends that Winslyn Industries, LLC (Winslyn) tortiously interfered in a contract between Empire and The Fireclay Factory LLC and Niko (INT) Ltd. (collectively, Fireclay) to produce sinks. Empire urges the Court to issue a preliminary injunction to prevent Winslyn from benefitting from its interference.

### Background

This is a case about fireclay sinks, which are formed from clay fired at very high temperatures. They have existed for many years but are newly popular among homeowners. This suit arises from Empire's allegation that Fireclay, a sink manufacturer, promised it would manufacture certain sink designs exclusively for Empire but then produced sinks with an indistinguishable design for Winslyn, another distributor, in breach of this promise.

### I.    Fireclay agrees to manufacture Empire's sinks

Empire manufactures and distributes countertops, sinks, and other kitchen and

bathroom accessories. Jacob Goren is the chief executive of Empire. Goren began designing a farmhouse-style fireclay sink in 2013 that he believed differed from others offered in the market. The sink was rectangular in design and featured thin walls, narrow-radius curves, and "contemporary styling." D.E. 74 ¶ 17 (Empire's Direct Examination Stmt. for Goren).

In July 2016, Fireclay and Empire began to discuss the prospect of Fireclay manufacturing products for Empire. Fireclay produces products made of fireclay for customers around the world. Peter Shilling is its managing director; Tony Wood and Charles Woodhead are employed by Niko, an affiliated entity.[1] Goren began sending sink designs to Shilling so that Fireclay could create molds for the design. The record indicates that Fireclay produced at least two models for Empire. Both models—the Olde London and the Sutton Place—featured the same underlying design. The bottom and side panels were identical; only the decorative front panel differed. The Olde London sink featured a decorative stripe known as a "rebate" that ran parallel to the edges of the front panel; the Sutton Place sink featured vertical bands along the front panel.

On March 21, 2017, Goren e-mailed Shilling to express concern that he had spent significant time developing the molds with Fireclay and was now "realizing that I may have done all this for my competition as our agreement is really one sided[.]" PX 17 at EMPIRE0000590-91. Goren expressed concern that his efforts were "helping to build a factory for the competition." *Id.* Goren offered to commit to continue purchasing

---

[1] Wood and Woodhead's relationship to Niko, and Niko's relationship to Fireclay, are not quite clear from the record, but it does not appear that the specifics of either relationship are material to the resolution of this case.

approximately 1000 sinks per month from Fireclay; in exchange, Fireclay would not sell any sinks in the United States.  In response, Wood said "I do understand your concerns," and he offered Goren two options for an agreement.  *Id.* at EMPIRE0000589-90.  The first consisted of two terms:  "[Fireclay] will supply exclusive products to your designs to your company only" and "OEM products for other possible customers could then be sold under a different design."  *Id.* at EMPIRE0000589.  Wood also stated "you can trust that we would not sell anyone else design as all I see that doing is undermining the market and chasing prices to the bottom."  *Id.* at EMPIRE0000590.  Goren agreed to this option.  Then, on May 15, Goren e-mailed Wood to ask for "a simple gentleman agreement" that "the products there [sic] were designed for us we only be sold to us, and that you will not put newer customer orders ahead of ours."  PX 19 at EMPIRE0000865.  Wood stated, "you do have my word and Peter [Shilling] will back me up the same that we would not sell your products to and one [sic] else."  *Id.*

## II.    Fireclay contacts Winslyn; they contract to produce additional sinks

As Fireclay exchanged e-mails with Empire, it was also communicating with Winslyn, another seller and distributor of kitchen products.  William Stuebner is the president, founder, and part owner of Winslyn.  In March 2017, Stuebner asked Fireclay which farmhouse-style sinks were available for sale.  Fireclay provided a list of available sinks, and Winslyn relied upon this list to solicit potential customers.  On June 2, Menard's, a major retailer, selected several sinks offered by Winslyn.  But the sinks that Menard's selected were the sinks that Goren had designed for Fireclay to make exclusively for Empire.

On June 19, Woodhead e-mailed Stuebner to inform him that the sink that Menard's wanted was not available because it belonged to another customer of Fireclay; he sent Stuebner pictures of an alternative design.  PX 40 at WINSLYN00000897 (June 19, 2017 Woodhead e-mail to Stuebner) ("there is a owner ship issue now as the customer has paid for the mould so we have amended to what we have sent on the image").  Wood also told Stuebner that "design rights" prevented Winslyn from obtaining the sinks that Fireclay produced for Empire.  *Id.* at WINSLYN000000896.  However, Stuebner found the alternative sinks "significantly different."  *Id.*  He did not accept the alternative and insisted on acquiring the original model that his customers ordered:

> Q.  And you're telling [Wood,] I imagine, "We've got millions of dollars on the line.  You're going to damn well send me that sink"?
>
> A.  You could imagine that.
>
> Q.  Correct.  Is that basically how it happened?
>
> A.  Yeah.  "I need my sink.  I've got business here."

May 30, 2018 Hr'g Tr. at 137-38.[2]  In response, Fireclay told Winslyn it would "need to amend the mould[.]"  PX 42 at WINSLYN00000905.[3]  When Stuebner again asked why Winslyn could not obtain the original design, Wood told Stuebner that Fireclay had another customer and "I had to agree we would only sell them that product."  *Id.*  Wood then proposed a new sink design for Winslyn.  But he also assured Winslyn that, based

---

[2] Each citation to Stuebner's testimony in this opinion relies on the rough  transcript of his testimony, which was the only version available at the time of decision.

[3] The parties have introduced evidence that the Olde London model was modified by adjusting the position of the rebate; it is unclear what changes, if any, were made to the Sutton Place model.

upon a comparison between an image of Empire's original design and Winslyn's new design, "You won't tell any difference of the photo shop." PX 43 at WINSLYN00001027 (July 3, 2017 Wood e-mail to Wang). Fireclay ended up producing sinks for Winslyn containing a very minor, arguably inconsequential, alteration to the front panel of the Olde London sink: it adjusted the rebate by less than two centimeters. By July 2017, Winslyn's customers placed orders for these new sinks, which Fireclay fulfilled.

### III. Empire learns of Fireclay's sales to Winslyn

While Fireclay was working with Winslyn to produce sinks, it continued to work alongside Empire as well. Goren had grown concerned that Fireclay was delivering its sinks at a slow pace, so he visited Fireclay's factory, located in the United Arab Emirates, in November 2017. Goren toured the factory and saw hundreds of sinks in production; he thought that Fireclay was finally producing sinks at the capacity it promised. But, after returning from lunch, he noticed sinks that contained only slight variations from the sinks he designed. When confronted, Fireclay told Goren that the sinks were for an Australian customer and would not be sold in the United States. Nonetheless, Goren was frustrated: he believed Fireclay used his design to make these sinks and had delayed shipments to Empire to produce sinks for another customer. Yet Empire later learned that Fireclay was selling these sinks to Winslyn in the United States.

On November 28, Goren e-mailed Wood, Shilling, and the Winslyn customer support e-mail address. Goren offered to forego litigation if Fireclay honored its agreement not to sell what he believed to be Empire's sink design. Goren also contacted a representative of Ferguson Enterprises, another retailer he believed was

receiving the sinks, to warn of Fireclay's obligation to Empire.

Stuebner e-mailed several Fireclay employees on November 30 to inquire about Goren's e-mail. In response, Wood said there was "no issue" and that the sinks about which Goren was e-mailing "ha[d] been in the market for many years." DX 36 at WINSLYN0001765 (Nov. 30, 2017 Wood e-mail to Stuebner).

Goren contacted Fireclay to urge it to uphold the exclusivity agreement. Fireclay denied that there was a binding exclusivity agreement and said that the sinks produced for Winslyn were not the same as Empire's sinks. On December 29, Fireclay notified Empire it terminated any contractual relationship they had.

## IV.    Empire files suit

On January 30, 2018, Empire filed a complaint against Winslyn, alleging tortious interference with contractual relations and tortious interference with prospective economic advantage. On March 28, Empire moved for a temporary restraining order and a preliminary injunction. On March 29, Empire amended its complaint to specifically request the Court to enjoin Winslyn from receiving additional Fireclay sinks. The Court denied Empire's motion for a temporary restraining order on April 6. On May 23, Empire filed a second amended complaint. This complaint named Winslyn, Fireclay, and Niko.[4] Though the complaint removed the claim of tortious interference with prospective economic advantage, it added claims for unjust enrichment, breach of contract, fraud, and civil conspiracy. Empire seeks an injunction to preclude Winslyn from continuing to market sinks from Fireclay using Empire's designs.

_____

[4] Winslyn contends Fireclay and Niko have not yet been served with process and they are not before the Court. But Empire does not seek to enjoin Fireclay or Niko, so the Court need not resolve this dispute now.

6

On May 30, the Court held an evidentiary hearing on Empire's motion for a preliminary injunction. The parties then filed post-hearing briefs.

## Discussion

Empire has moved for a preliminary injunction. To obtain a preliminary injunction, Empire must first show it has "some likelihood of success on the merits," no adequate remedy at law, and will suffer irreparable harm if the injunction is denied. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). If Empire can meet these requirements, the Court then balances the harm Empire would suffer if the injunction is denied against the harm Winslyn would suffer if the injunction is granted. *Id.*

Before proceeding to the merits of Empire's preliminary injunction motion, the Court must address two points at the onset to clarify the decision that follows. First, Empire peppers its briefs with terms like "proprietary design," suggesting a claim based on, perhaps, trade dress. But it does not actually assert a claim on that basis. Rather, Empire has argued, and the Court restricts its analysis to, Empire's likelihood of success on a claim that it entered into an enforceable contract restricting Fireclay's ability to sell Empire's sink design to others and whether Winslyn intentionally interfered with that contract. In its briefs, Winslyn addresses what it believes to be Empire's "implied confidentiality theories," but the Court only understands Empire as asserting a straightforward contract-based claim.[5]

The second point follows from the first. The scope of injunctive relief is limited to

---

[5] The Court thus does not resolve Winslyn's arguments regarding purported intellectual property rights, Winslyn Resp. to Pl.'s Mot. for Prelim. Inj. at 14-15, Winslyn Closing Args. in Opp. to Pl.'s Mot. for Prelim. Inj. at 3, or its "misappropriation and implied confidentiality theories," Winslyn Resp. to Pl.'s Am. and Supp. Mem. of Law at 8.

the contractual theory Empire put forward.  Empire cannot obtain an injunction that protects its "designs" beyond whatever its contract with Fireclay would protect.  The preliminary injunction would restore the parties to the point prior to Fireclay's purported breach, by limiting Winslyn from purchasing, marketing, and selling sinks sold by Fireclay that contravene its contractual obligations to Empire.  "[I]t is the last uncontested status preceding the controversy which is to be maintained by the court, rather than a status wrongfully altered by unilateral action after dispute has arisen." *LTD Commodities, Inc. v. Perederij*, 699 F.2d 404, 406 (7th Cir. 1983).  With these points in mind, the Court proceeds to the merits of Empire's claim.

**I.     Likelihood of success**

To obtain a preliminary objection, "[t]he threshold factor is the likelihood of success on the merits."  *Rust Envtl. & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1213 (7th Cir. 1997) (citation omitted).  The "likelihood of success" threshold is a "low" one.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). To clear this threshold, Empire must show that it has a "better than negligible chance" or "some likelihood" of success on the merits of its tortious interference with contractual relations claim.  *Id.* at 1096, 1100.  Importantly, the Court's inquiry is into the *likelihood* that Empire will prevail on its claim; it does not reach any conclusions on the ultimate outcome of the trial.  *See Ty, Inc.*, 237 F.3d at 897-98.

Empire originally sought an injunction for Winslyn's purported interference with contract and interference with prospective business relations, but Empire dropped the latter claim.  Empire asserted an unjust enrichment claim in its second amended

complaint and, in its post-hearing brief, argued this claim as a basis for a preliminary injunction. Because the Court concludes Empire is entitled to a preliminary injunction on its interference with contract claim, it need not address the unjust enrichment claim.

Before reviewing Empire's likelihood of success on the merits, the Court reviews three arguments that Winslyn contends keep Empire's interference with contract claim from ever leaving the starting gate. First, Winslyn contends that Empire cannot bring an interference with contract claim because it is barred by the economic loss doctrine, which forbids recovery in tort for economic loss alone. *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 81, 435 N.E.2d 443, 448 (1982). This is easily addressed: Illinois law does not apply the economic loss doctrine to interference with contract claims. *2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill. 2d 302, 315, 555 N.E.2d 346, 352 (1990).

Next, Winslyn contends there is nothing for the Court to enjoin, as Empire's contractual rights with Fireclay have now been terminated and thus there can be no prospective breach. But this effectively amounts to an argument that a preliminary injunction is *never* available on a claim of tortious interference with contract (or, for that matter, a claim of breach of contract) because the contract has already been breached and thus there is no future harm to enjoin. Winslyn cites no authority supporting this contention. That aside, Winslyn's argument conflates two distinct issues: whether Empire is likely to prevail on the merits of its interference with contract claim (which requires Empire to demonstrate that a contract was breached, not that a breach is

imminent),[6] and whether Empire faces irreparable harm. Empire can suffer harm from Winslyn's interference with its contract so long as Winslyn continues to purchase more sinks from Fireclay, even if these transactions do not constitute new and separate breaches.

Third, Winslyn contends that the Empire-Fireclay contract was terminable at will and that such a contract cannot support a tortious interference claim. As Winslyn argues, contracts of indefinite duration are disfavored in Illinois, as the contracts would otherwise impose "perpetual" obligations. *Rico Indus., Inc. v. TLC Grp., Inc.*, 2014 IL App (1st) 131522, ¶ 19. Thus a contract of indefinite duration is considered to be terminable at will. *Jespersen v. Minn. Min. and Mfg. Co.*, 183 Ill. 2d 290, 295-96, 700 N.E.2d 1014, 1017 (1998). And, under Illinois law, an at-will contract cannot underpin an interference with contract claim. *Prudential Ins. Co. of Am. v. Sipula*, 776 F.2d 157, 162 (7th Cir. 1985). Winslyn concludes Empire's interference with contract claim fails, as it concerns an at-will contract that cannot support such a claim.

The Court disagrees with Winslyn's conclusion, for two reasons.[7] First, it is not clear that, under Illinois law, Empire's contract is an at-will contract. Illinois law treats a contract of indefinite duration as terminable at will, unless "a period of duration can fairly be implied from the nature of the contract." *Carrico v. Delp*, 141 Ill. App. 3d 684, 689, 490 N.E.2d 972, 976 (1986). As discussed below, the evidence tends to show that

---

[6] This is why, for instance, a plaintiff can seek a preliminary injunction for a breach of contract that occurred wholly in the past. *See, e.g., Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 592-93 (7th Cir. 1986).

[7] Empire tries to avoid Winslyn's at-will contract argument by suggesting that New Jersey law, not Illinois law, governs this issue. But it is a little late to argue this, especially as Empire itself previously used Illinois law to support its request for an injunction. In any event, the choice of law would not change the outcome on this issue.

Empire and Fireclay contracted for Fireclay to produce certain designs exclusively for Empire. If Fireclay could obtain the benefits of Empire's support—developing the designs, preparing the molds, obtaining Empire's eventual business—and then walk away from its obligation to produce Empire's designs exclusively for Empire, then "the plaintiff[ ] obtained no benefit" from its performance. *Id.* at 689, 490 N.E.2d at 976. Moreover, "[w]hen consideration for a promise requiring continuing performance has been partly executed, a court will be reluctant to hold that the promise is determinable at the promisor's pleasure.").

*E.J. Brach Corp. v. Gilbert International, Inc.*, No. 90 C 1399, 1991 WL 148914 (N.D. Ill. June 18, 1991), is instructive. In that case, Gilbert, a distributor, entered into an agreement with Brach, a candy manufacturer, to distribute Brach's candy across Canada. *Id.* at *1. Gilbert invested in promotional activities to boost Brach's goods, but Brach subsequently breached its contract well before Gilbert could benefit from its investment by retailing the candies. *Id.* After Gilbert filed suit, Brach contended that the parties agreed to a contract of indefinite duration, so it was terminable at will and there was no breach. *Id.* at *3. The court disagreed, finding that Brach's interpretation would be at odds with the contract, which implied a term of duration long enough for Gilbert to have a fair opportunity to recoup its initial investment. *Id.* at *4.

The Court finds that the Empire-Fireclay agreement implies a comparable term of duration. Specifically, the contract implies a period of duration long enough for Empire to recover the time and money it expended to develop Fireclay's capacity to produce its sinks. The Court need not determine the duration of this period now—to resolve Winslyn's argument, it is sufficient to conclude that, if there were a contract, it was not

terminable by Fireclay at will.

Moreover, even if the contract to supply Empire with sinks was terminable by Fireclay at will, and Fireclay terminated it, that would not relieve Fireclay from its exclusivity undertaking. Empire directs the Court's attention to two cases in support of this proposition. First is a case in which the plaintiff asserted a breach of contract claim against a defendant who acted contrary to a licensing agreement that had previously expired. *CustomGuide v. CareerBuilder, LLC*, No. 11 C 945, 2011 WL 5822417, at *2-3 (N.D. Ill. Nov. 15, 2011). The court concluded that licensing agreements "contemplate an action for breach of contract if the licensee continues to use the licensed material after the license expires." *Id.* at *3. Thus the plaintiff could bring a breach of contract claim for violation of the licensing agreement, even though it was based upon an expired contract. Second is a case in which the parties formed an agreement that included a clause controlling the use of the plaintiff's confidential information. *Miller UK Ltd. v. Caterpillar Inc.*, No. 10 C 3770, 2015 WL 6407223 (N.D. Ill. Oct. 21, 2015). The defendant contended that the parties terminated the contract and, as a result, the defendant was no longer bound to protect the plaintiff's confidential information. *Id.* at *2. The court disagreed, finding that "[the confidentiality] limitations can only be given full effect if they survive termination of the Supply Agreement." *Id.* Both of these cases stand for the proposition that parties are not free to violate an obligation that, to have meaning, must survive the termination of the contract. Thus, even assuming Empire's agreement with Fireclay was otherwise terminable at will, Fireclay's exclusivity undertaking extended beyond the termination of the agreement. In sum, Empire's tortious interference claim is not barred by the nature of the underlying contract. The

Court therefore turns to whether Empire established a likelihood of success on the claim.

To prevail on a tortious interference with contract claim, Empire must show: "(1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the third party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach." *Wheel Masters, Inc. v. Jiffy Metal Prods. Co.*, 955 F.2d 1126, 1129 (7th Cir. 1992) (applying Illinois law). The Court reviews each element to determine whether Empire has a reasonable likelihood of prevailing at trial.

### A. Valid and enforceable contract

First, Empire showed a reasonable likelihood that a valid and enforceable contract existed between Fireclay and Empire. Empire presented several e-mails from which a contract could reasonably be construed. On March 25, 2017, Wood (of Fireclay) proposed an agreement to Goren with two terms:

- "We will supply exclusive products to your designs to your company only"

- "OEM products for other possible customers could then be sold under a different design."

PX 17 at EMPIRE0000589 (Mar. 25 2017 Wood e-mail to Goren). Goren accepted the offer. *Id.* at EMPIRE0000588. Wood also affirmed to Goren "you do have my word and Peter will back me up the same that we would not sell your products to and one [sic] else." PX 19 at EMPIRE0000865 (May 15, 2017 Wood e-mail to Goren).

Winslyn argues that these e-mails do not document a binding contract between Empire and Fireclay, for four reasons: (1) Empire's characterization of the contract has

changed throughout the litigation; (2) the contract lacked consideration; (3) the contract is not sufficiently definite; and (4) the contract is unenforceable as a matter of law. Winslyn first argues that Empire's definition of the contract has shifted over the course of the litigation. This is obviously not a basis for concluding that Empire has no chance of establishing a contract exists. Winslyn also notes that Empire admitted at one point that it never entered a "formal, signed, written agreement" with Fireclay. *See* D.E. 16-1 ¶ 12 (Goren Decl.). But an enforceable contract can exist without being signed or written; this is not a reason for concluding no contract exists.

Second, Winslyn suggests that it did not receive any consideration in exchange for its promise. *Village of South Elgin v. Waste Mgmt. of Ill., Inc.*, 348 Ill. App. 3d 929, 940, 810 N.E.2d 658, 669 (2004) (consideration is "an act or promise that is a benefit to one party or a detriment to the other party") (citations omitted). Winslyn contends that Empire promised only that "we will do our best to make sure you do not need to look for more business," PX 17 at EMPIRE0000588, and it argues that this would be an illusory promise. But Empire presented additional evidence of consideration: a promise of a steady stream of product orders, as many as 1000 sinks per month. *Id.* at EMPIRE0000590-91.

Third, Winslyn argues that the alleged understanding was insufficiently definite to be an enforceable agreement. The record reflects that, in exchange for Empire's investments in Fireclay's capacity and its ongoing orders, Fireclay agreed not to produce its sinks for others, which is sufficiently definite "so that the terms are either determined or may be implied." *Penzell v. Taylor*, 219 Ill. App. 3d 680, 688, 579 N.E.2d 956, 961 (1991) (citations omitted).

Finally, Winslyn contends that, if the contract protects anything beyond the precise designs Empire offered to Fireclay, then it is unenforceable under Illinois law, citing *Peerless Industries, Inc. v. Crimson AV, LLC*, No. 11 C 1768, 2012 WL 3686774 (N.D. Ill. Aug. 24, 2012). At issue in *Peerless* was an agreement between Peerless, the manufacturer, and Sycamore Manufacturing, a supply company. Under the agreement, Peerless had the ability to bar Sycamore from selling any product that, in Peerless's "reasonable judgment," was "substantially similar" to or contained "any part of the design of any Peerless Product." *Id.* at *2. The court concluded that the restriction was so overly broad as to be unenforceable. *Id.* But *Peerless* does not render the Empire-Fireclay contract unenforceable. The parties' contract does not contain the largely unbridled discretionary term that the Peerless contract contained. Empire has a reasonable likelihood of showing a valid and enforceable contract exists.

**B.    Knowledge**

Second, Empire has demonstrated a reasonable chance of showing that Winslyn was aware of the contract. Empire must establish that Winslyn knew of "the existence of the contract" or "facts from which a contract could reasonably have been inferred." *Wheel Masters*, 955 F.2d at 1130; *Farley v. Kissel Co.*, 18 Ill. App. 3d 139, 146, 310 N.E.2d 385, 389 (1974). Winslyn contends that Empire can prevail only if the Court decides that Winslyn had a duty of inquiry. The Court disagrees: Empire has shown a reasonable likelihood of success on the merits based on the traditional understanding of knowledge—actual knowledge of a contract or facts from which the contract's existence could be inferred. *Wheel Masters*, 955 F.2d at 1130.

Empire has presented evidence permitting a finding that Winslyn knew Fireclay

had a contractual obligation to another party. On June 19, after telling Fireclay that Menard's was interested in the sink models Fireclay was to make for Empire, Stuebner received an e-mail from Fireclay depicting the sinks that Fireclay would manufacture for Winslyn. PX 40 at WINSLYN00000897 (June 19, 2017 Stuebner e-mail to Woodhead). The pictures were of sinks considerably different from the Empire models Winslyn had first been shown; as Stuebner said, the pictures were "significantly different than the models of the original pricing sheet . . . Is there some type of ownership issue with the mold?" PX 40 at WINSLYN00000896. In response, Woodhead stated "there is a owner ship issue now[.]" *Id.* Wood also e-mailed to state that "[t]here are design rights on the existing as we said up front." *Id.* Wood's reference to what he had said "up front" suggests that Winslyn was aware of the contract even before June 2017. In any event, in late June, Wood sent Stuebner an e-mail that made it clear that Fireclay had an agreement with another party for exclusive production of the sinks: he wrote, "What I am trying to say is that I was working with a few customers and . . . to take this order I had to agree we would only sell them that product." PX 42 at WINSLY00000905. It is difficult to escape the conclusion that Winslyn was aware of the existence of the contract at least at that point.

If Winslyn is contending that Fireclay had already breached the contract by the time Winslyn learned of it, the Court disagrees. A contract imposing a continuous obligation may be breached multiple times if the breach is partial, but just once if the breach is material. *Hi-Lite Prods. Co. v. Am Home Prods. Co.*, 11 F.3d 1402, 1410 (7th Cir. 1993); *Troya Int'l, Ltd. v. Bird-X, Inc.*, No. 15 C 9785, 2017 WL 6059804, at *7 (N.D.

Ill. Dec. 7, 2017).[8]  A breach is material if it is "so substantial and fundamental as to defeat the objects of the parties in making the agreement."  *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 43.  There is nothing in the record to indicate that Fireclay materially breached its contract with Empire until it actually sold sinks using Empire's design to Winslyn—which occurred around July 2017, *after* Winslyn was apprised of the contract and, as Empire contends, induced Fireclay to breach it.  So Empire has shown a reasonable likelihood that Winslyn was aware of a valid and enforceable contract.

### C.    Intentional inducement

Third, there is evidence tending to establish that Winslyn intentionally induced Fireclay to breach its contract with Empire.  Empire attempts to argue that Winslyn acted intentionally by remaining willfully ignorant of Empire's contractual rights, citing *Downers Grove Volkswagen, Inc. v. Wiggleworth Imports, Inc.*, 190 Ill. App. 3d 524, 546 N.E.2d 33 (1989), and *Global-Tech Appliances, Inc. v. SEB SA*, 563 U.S. 754 (2011), but the Court need not adopt a "willful ignorance" standard for liability to conclude Winslyn is reasonably likely to prevail on intentional inducement.

Illinois law "requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another"; the party must engage in "some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way."  *The Pampered Chef v. Alexanian*, 804 F.

---

[8] Empire also relies on less persuasive authorities to illustrate continuous breaches; the Court does not address the relevance of these cases here.  *Neuromonitoring Assocs. v. Centura Health Corp.*, 351 P.3d 486, 492 (Colo. Ct. App. 2012); *Noonan v. Nw. Mut. Life Ins. Co.*, 276 Wis. 2d 33, 49-50, 687 N.W.2d 254, 262 (Wis. Ct. App. 2004).

Supp. 2d 765, 802 (N.D. Ill. 2011) (*quoting In re Estate of Albergo*, 275 Ill. App. 439, 446, 656 N.E.2d 97, 103 (1995)).  "The essential thing is the purpose to cause the result."  *Farley*, 18 Ill. App. 3d at 147, 310 N.E.2d at 390.

Empire has met its burden.  After Fireclay informed Winslyn that it could not sell it the sinks that Goren designed, Fireclay offered a replacement sink.  But Stuebner was dissatisfied, as it was too different from the original designs.  PX 40 at WINSLYN000000896 (June 19, 2017 Stuebner e-mail to Wood).  Stuebner testified during a deposition that he told Fireclay, after being informed of the conflicting rights, "I need that design."  May 30, 2018 Hr'g Tr. at 128.  Stuebner then contacted Wood via telephone; he reported the results of the call in subsequent testimony.  As Stuebner testified:

> Q.  So at the end of that call, the conclusion was that notwithstanding that another customer had rights to the design, another customer had the rights to the mold, Tony was going to sell you the sink anyway, correct?
>
> A.  After the phone call, he told me, correct.

*Id.*  Fireclay subsequently proposed to modify the designs, which it did through design alterations measured by the millimeter, at least for the Olde London model.  Wood later assured Stuebner that "you would not know the difference," PX 42 at EMPIRE000905, and that "[y]ou won't tell any difference[.]"  PX43 at WINSLYN00001027.  The reasonable inference is that Stuebner pressured Fireclay to sell the sinks that Wood said Fireclay had agreed not to sell to anyone other than its other contracting party and that Fireclay made an inconsequential change to provide a fig leaf covering its breach.  This evidence points to the sort of "active persuasion, encouragement, or inciting" required under Illinois law.  *Pampered Chef*, 804 F. Supp. 2d at 802.

Winslyn contends that its conduct was not intentional, because it had no knowledge that Fireclay was breaching a contract: it merely asked for the sinks to sell to its customers, and Fireclay provided sinks. But that argument is torpedoed by Wood's earlier references to an agreement not to sell sinks with this design to anyone other than the party he described as having the design rights. The tort of intentional interference with contract extends to conduct in which the party "knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts § 766 cmt. j; *JamSports & Entm't, LLC v. Paradama Prods., Inc.*, 360 F. Supp. 2d 905, 906 (N.D. Ill. 2005) ("Illinois courts have frequently relied on the Restatement (Second) of Torts in assessing tortious interference claims"). The evidence is sufficient to show that is what took place here. Fireclay informed Winslyn it could not provide sinks with that design because of an agreement with another party; Winslyn then pressured Fireclay to provide the sinks anyway; and then Fireclay offered, and Winslyn accepted, sinks that Fireclay itself said were indistinguishable from the original sinks. Empire has a reasonable likelihood of showing that Winslyn acted knowing that these sales would breach the prior agreement.

### D.  Breach caused by inducement

Fourth, the Court finds Empire is reasonably likely to succeed on showing that Winslyn's inducement caused Fireclay to breach its agreement with Empire. Empire must show it has a reasonable chance of prevailing on two questions: whether a breach occurred and, if so, whether Winslyn's inducement caused that breach.

The first question is whether a breach occurred, that is, whether production of the sinks for Winslyn amounted to a breach of Fireclay's promise to produce Empire's

designs exclusively for that company.  This is a question of fact that a jury ultimately will have to resolve.  *See, e.g., Stevens v. Protectoseal Co.*, 27 Ill. App. 3d 724, 731, 327 N.E.2d 427, 432 (1975) (reversing district court and ordering a jury trial on, among other things, "whether the [party's] actions constituted a breach of those agreements"). Based on the current record, the Court finds that Empire is reasonably likely to establish that Fireclay breached its contract.  Fireclay promised that "[w]e will supply exclusive products to your designs to your company only[.]"  PX 17 at EMPIRE0000589 (Mar. 25, 2017 Shilling e-mail to Goren).  The e-mails between Fireclay and Empire do not elaborate on the scope of "your designs."  Empire contends that the scope of the term is defined by another passage in the same e-mail, in which Fireclay states it does not want to "undermin[e] the market and chas[e] prices to the bottom."  *Id.* at EMPIRE0000590. Empire infers from this Fireclay promised not to sell *any* sink that would undermine the market or push Empire's prices downwards.  This seems to be an overly broad reading, but the Court need not resolve this contention here, as it does not control the outcome of the motion.

As memorialized in an e-mail between Wood and Stuebner, Fireclay created a sink for Winslyn in which an Olde London mold created for Empire was modified, albeit slightly:  "We need to amend the mould on the 018 to have a rebate off 7.5mm as we have now take a live order for the existing mould[.]"  DX 33 at WINSLYN00001027 (June 28, 2017 Wood e-mail to Stuebner).  Wood sent a follow-up e-mail to assure Winslyn that "You won't tell any difference of [sic] the photo shop."  *Id.*  In a later e-mail, Stuebner wrote "that the design change will have minimal impact on the aesthetics." DX 32 at WINSLYN00005529.  It is not clear what, if any, changes were made to the

Sutton Place mold.  The Court concludes that Empire has shown a reasonable likelihood of success on its contention that Fireclay breached its contract with Empire by selling virtually indistinguishable sinks to Winslyn.  For this purpose, it is sufficient that Fireclay itself said the changes were inconsequential and that Winslyn, which had insisted on getting the exact design it had earlier requested, found the sinks met its purposes.

In challenging Empire's contention that Fireclay's production of sinks for Winslyn constituted a breach of an enforceable contractual obligation between Fireclay and Empire, Winslyn argues that there was nothing about the design that amounted to a trade secret or protectable intellectual property and that, as a result, Empire cannot complain about Fireclay's sale of similar sinks to others.  In this regard, the parties dispute the applicability of several authorities addressing  whether an idea or design must be novel or new in order to be subject to a legally enforceable confidentiality undertaking.  *See, e.g., Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 377 (2d Cir. 2000); *Jones v. Ulrich*, 342 Ill. App. 16, 33, 95 N.E.2d 113, 121 (1950).  The Court need not discuss these authorities in detail.  It is sufficient to say that to prevail under these cases (assuming they govern), Empire is not required to show that its design was novel *to the world*, but only as to Fireclay—which it plainly was.  Fireclay's use of the design for its own purposes and for that of a third party (Winslyn) constituted an actionable breach of its exclusivity undertaking even if the design may not have been protectable by the law of trade dress, copyright, or patent, or as a trade secret.

The Court concludes Empire has a reasonable likelihood of success on its contention that Fireclay breached their agreement and that Winslyn induced the breach.

As Empire argues, Fireclay initially refused to sell Empire's sinks to Winslyn, noting that there was another party that had the rights to the sink; Stuebner, on behalf of Winslyn, expressed his displeasure with Fireclay's decision and insisted on getting the sinks whose design he had seen; and Fireclay subsequently crafted a virtually-identical sink to sell to Winslyn.

### E. Injury

Finally, Empire is reasonably likely to show it was damaged by the breach. Specifically, there is sufficient evidence that Winslyn's sale of the sinks has endangered Empire's relationship with customers, threatened the pricing that it wished to use for the sinks, and cost it revenue in the form of sales that Winslyn obtained and, potentially, the revenues foregone by the lower prices Winslyn fostered. For instance, one of Winslyn's customers expressed its intent to "disrupt" the pricing of farmhouse-style fireclay sinks. PX 37 at WINSLYN00005192 (Mar. 23, 2017 Stuebner e-mail to Shilling). And although the breach that Winslyn induced has occurred, it will continue to benefit from the breach, to Empire's detriment, unless and until it is enjoined from doing so.

In sum, Empire has shown a reasonable likelihood of success on its claim that Winslyn intentionally interfered with Empire's contractual relationship with Fireclay.

## II. Remaining preliminary injunction factors

Empire must demonstrate "it will suffer irreparable harm in the interim period prior to final resolution of its claims" and that "traditional legal remedies would be inadequate." *Girl Scouts*, 549 F.3d at 1086. The Court will hold a plaintiff to a lower showing of irreparable harm if the plaintiff makes a greater showing of prevailing on the merits, and vice versa. *Id.* If Empire makes the required showing, the Court "must

consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer. Finally, the court must consider the public interest . . . in denying or granting the injunction." *Ty, Inc.*, 237 F.3d at 895 (citation omitted).

Initially, the Court addresses two points cited by Winslyn that it contends weigh against extending any equitable relief to Empire. First, Winslyn contends that Empire has moved too slowly in its attempt to obtain an injunction. "Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered." *Ty, Inc.*, 237 F.3d at 903. A delay in moving for a preliminary injunction is less likely to be acceptable if the defendant was "lulled into a false sense of security" or "acted in reliance on the plaintiff's delay." *Id.* at 903. There is no evidence of that happening here; Empire has acted with alacrity in defending its rights, as the record reveals.

Next, Winslyn argues that Goren, who purportedly lied to Fireclay by stating he retained intellectual property attorneys in 2017, has unclean hands, which precludes Empire from obtaining equitable relief. *Pampered Chef*, 804 F. Supp. 2d at 801 ("The unclean hands doctrine closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief"). Even assuming Goren's misconduct were serious enough to meet the threshold for unclean hands, it does not relate to the matter at hand. Unlike in *Pampered Chef*, in which the plaintiff engaged in the same conduct for which it sued the defendant, Goren's misrepresentation lacks any nexus to the conduct for which Empire sued Winslyn. *Int'l Union, Allied Indus. Workers of Am. v. Local Union No. 589, Allied Indus. Workers of*

*Am.*, 693 F.2d 666, 672 (7th Cir. 1982) ("the clean hands doctrine only applies when there is a direct nexus between the bad conduct and the activities sought to be enjoined.").

The next question is whether Empire has suffered or will suffer irreparable harm for which it lacks an adequate remedy at law.  Empire contends that Winslyn could harm its "protectable interest" in its "proprietary design," but this is the sort of argument, sounding in intellectual property rights, that Empire has sworn off repeatedly—Empire does not argue it has any copyright, trade secret, or patent rights in the product at issue. More compellingly, however, Empire cites the risk of impairing the pricing it intended to set for its sinks, the market share it could exploit, and its overall revenues.  These harms would compound while awaiting trial, as the effect of Winslyn's sink sales would presumably increase if, during the litigation, Winslyn continued to buy, and then distribute, more sinks from Fireclay.

Winslyn disputes Empire's characterization and contends Empire will not be harmed, as it does not have any customers or market share for these sinks—Empire can't suffer injuries from changes in pricing or distribution of market share if it doesn't have customers.  Even if Empire had no current injury, part of the purpose of an injunction is to prevent future harm.  That aside, Winslyn's argument cuts against Winslyn as much as it does against Empire.  If Empire worked for months to design a sink yet now has no revenue to show for it, that is indicative that Empire *has* been harmed.  Winslyn further argues that Empire has failed to present evidence of the injuries it describes.  But "a legal rule that irreparable injury can be established *only* by a concrete demonstration would make injunctions useless as a practical matter. . . . it is

24

precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'"  *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 272, 880 N.E.2d 188, 198 (2007) (*quoting Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  The record shows a real danger that Empire will be harmed in the absence of an injunction; Empire need not prove that it already has been harmed.

Empire has also sufficiently shown the inadequacy of its remedy at law.  "[T]here are cases in which the normal remedy for a breach of contract, namely damages, is inadequate, and those are cases in which the victim of an alleged breach can seek preliminary relief."  *Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 945 (7th Cir. 2006).  Empire presents two reasons why money damages are inadequate.  First, Empire contends that Winslyn is likely to become insolvent before final judgment, which means it could never obtain damages.  *Roland Mach.*, 749 F.2d at 386.  On the present record, however, Empire has not provided sufficient support for this contention.  More persuasive is Empire's second position:  it will be difficult to calculate its actual damages.  *Id.*  Empire's damages are based on the harm to its revenue:  it contends Winslyn will cause prices for the sinks to decline and will encroach on its market share.  If Empire's claim is meritorious, then its ability to develop and exploit a market for its sinks has been impaired.  It is not apparent that Winslyn's profits will adequately compensate Empire for its injuries.  Calculating appropriate damages will be difficult enough that damages at law would be inadequate.

The Court next considers the injuries that Winslyn would suffer from the imposition of an injunction.  Winslyn contends that it will suffer significant harm, as it is a young company that would lose the confidence of its customers if it were no longer able

to sell its sinks. But, as Empire notes, Winslyn will not be enjoined from operating altogether: the injunction would only bar it from buying sinks that run afoul of Fireclay's exclusivity agreement with Empire. Indeed, Winslyn could, as it says, "copy the Empire product"—just not through Fireclay. Winslyn Resp. to Pl.'s Mot. for Prelim. Inj. at 14. In any event, Winslyn effectively brought upon itself any hardship it will have to bear due to an injunction. Fireclay communicated that there were design rights attached to the sink and that it had agreed not to sell it to others, but Winslyn nonetheless pushed Fireclay to sell it sinks that Fireclay described as indistinguishable from the one it could not sell. *See Ty, Inc.*, 237 F.3d at 903 (noting that a court should "exclude[]" the burden a defendant "voluntarily assume[s] by proceeding in the face of a known risk").

Having balanced the various interests "sitting as would a chancellor in equity . . . seeking at all times to minimize the costs of being mistaken." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992) (internal quotation marks and citation omitted), the Court finds that the balance of hardships favors entry of an injunction. (The Court notes that it has considered the potential for an adverse effect on the public, a factor addressed only briefly by the parties, and finds it negligble.) The parties are to return to the status quo until Empire's claims are resolved on the merits. The status quo, "considered to be the last uncontested status[] which preceded the lawsuit," is one in which Winslyn does not acquire Fireclay sinks that are within the scope of the Empire-Fireclay agreement. *Am. Hosp. Ass'n*, 625 F.2d at 1332.

## III.    Security

Under Federal Rule of Civil Procedure 65, "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him[.]" *Ty, Inc.*, 292 F.3d at 516. Neither party has addressed this point, so the Court sets a bond of $100,000, subject to modification if either side can show that the amount is inappropriate.

## Conclusion

For the foregoing reasons, the Court grants Empire's motion for a preliminary injunction [dkt. no. 15]. Upon posting of the required bond, and pending entry of a more detailed order, the Court enjoins Winslyn Industries, LLC and anyone affiliated or acting in concert with it, pending the trial or other disposition of this case, from purchasing, marketing, or selling sinks obtained from The Fireclay Factory, LLC based on plaintiff Empire Industries, LLC's Olde London and Sutton Place designs, including Winslyn's BTL041, 43, 50, and 52 models. The case is set for a status hearing on July 2, 2018 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 21, 2018