IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EMPIRE INDUSTRIES INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 18 C 698 |
| ) | |
| WINSLYN INDUSTRIES, LLC and ) | |
| THE FIRECLAY FACTORY LLC, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Empire Industries Inc., a bathroom and kitchen product distributor, has moved for a preliminary injunction against The Fireclay Factory LLC, a sink manufacturer. Empire contends that Fireclay agreed to produce sinks based on Empire's designs exclusively for Empire but breached the agreement by selling sinks with an indistinguishable design to Winslyn Industries, LLC, an Empire competitor. In June 2018, Empire sought and obtained a preliminary injunction barring Winslyn from purchasing, marketing, or selling sinks from Fireclay based on Empire's designs. Empire then added Fireclay as a defendant and filed what it termed a motion to "extend" the preliminary injunction to Fireclay, asking the Court to bar it from using sink molds based on Empire's designs to produce sinks for other customers. From March 1 to March 3, 2021, the Court held an evidentiary hearing on Empire's motion. This constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(2).

### Background

The Court assumes familiarity with this case's general factual and procedural

background, which the Court has described in its prior written opinions. See *Empire Indus. Inc. v. Winslyn Indus., LLC*, No. 18 C 698, 2021 WL 214639 (N.D. Ill. Jan. 21, 2021) (*Empire II*); *Empire Indus. Inc. v. Winslyn Indus., LLC*, No. 18 C 698, 2020 WL 3100581 (N.D. Ill. June 11, 2020); *Empire Indus. Inc. v. Winslyn Indus., LLC*, No. 18 C 698, 2019 WL 2743470 (N.D. Ill. June 30, 2019); *Empire Indus. Inc. v. Winslyn Indus., LLC*, No. 18 C 698, 2019 WL 339544 (N.D. Ill. Jan. 28, 2019); *Empire Indus. Inc. v. Winslyn Indus., LLC*, 327 F. Supp. 3d 1101 (N.D. Ill. 2018) (*Empire I*). The following is a brief synopsis, as relevant for the purposes of the present order.

**A.     Factual and procedural background**

In 2013, Empire, a New Jersey-based distributor of bathroom and kitchen products, developed two designs for farmhouse-style kitchen sinks. Jacob Goren, Empire's chief executive, created designs that included a rectangular sink with thin walls, narrow-radius curves, and a contemporary style. In May 2016, Fireclay, a sink manufacturer based in the United Arab Emirates, approached Goren about manufacturing sinks based on Empire's designs. Empire contends that the parties entered into an agreement under which Empire would provide sink designs to Fireclay, which would manufacture sinks based on those designs exclusively for Empire to sell in the United States. Empire also contends that it acquired ownership of or the rights to the molds that Fireclay built to manufacture the sinks. Empire alleges that Fireclay breached the agreement by producing sinks indistinguishable from Empire's design for Winslyn, another distributor, to sell in the United States.

In November 2017, Goren confronted Fireclay representatives—Peter Shilling, Fireclay's managing director, and Tony Wood, who works for a Fireclay affiliate—about

2

Fireclay's breach. Goren offered to forego litigation if Fireclay would honor the exclusivity arrangement going forward. Fireclay denied the existence of a binding exclusivity agreement and stated that the sinks it produced for Winslyn were different from Empire's sinks in any event. In December 2017, Wood notified Goren that Fireclay was terminating any contractual relationship it had with Empire. Empire sued Winslyn in January 2018, alleging tortious interference with the exclusive agreement between Empire and Fireclay. Empire did not add Fireclay to the suit until later.

In June 2018, the Court preliminarily enjoined Winslyn "and anyone affiliated or acting in concert with it . . . from purchasing, marketing, or selling sinks obtained from The Fireclay Factory, LLC based on plaintiff Empire Industries, LLC's . . . designs." *Empire I*, 327 F. Supp. 3d at 1118. The Court then modified the injunction to apply to "sinks obtained from The Fireclay Factory, LLC with a design that is identical to or visually distinguishable from plaintiff Empire Industries, LLC's Olde London and Sutton Place designs." Modified Prelim. Inj. Order (dkt. no. 105).

On June 1, 2020, Empire filed its current motion, asking the Court to bar Fireclay from using sink molds based on Empire's designs. The Court held an evidentiary hearing on Empire's motion for a preliminary injunction from March 1 through March 3, 2021.

**B.     2021 evidentiary hearing**

    **1.     Empire and Fireclay's agreement**

The parties' dealings that led to their agreement were conducted in significant part by e-mail, as Empire's principal Goren was located in the United States and Fireclay's representatives were located overseas. Those dealings began at some point

prior to late July 2016.  Fireclay's managing director Shilling introduced himself to Goren through an e-mail dated July 20, 2016.  There appears to have been a fair amount of discussion before that regarding Empire's proposed sink designs and Fireclay's ability to produce sinks in quantities sufficient for Empire.  Shilling assured Goren that Fireclay would be able to meet Empire's requirements.

In response, Goren requested "3-4000" pieces of a sink model based on Empire's design.  FX 41 at EMPIRE0000011-12 (July 20, 2016 Goren e-mail to Shilling). Shilling then e-mailed a "pro forma" invoice to Goren; Goren understood that the pro forma's terms required Empire to pay a $9,000 deposit before Fireclay would begin producing sinks based on Empire's designs.  FX 54 at EMPIRE0000179 (July 24, 2016 Goren e-mail to Shilling stating "I just looked at the Performa [sic] again and I see the terms . . . we will wire you [$] 9[,]000 . . . on Monday but please revise the Performa [sic] to our import[] company [Your Global Warehouse]"); FX 54 at EMPIRE0000180 (July 23, 2016 Shilling e-mail to Goren with pro forma invoice).  Shilling then revised the pro forma and e-mailed Goren a modified invoice, which included a quantity of 360 sinks, priced at $100 per unit, for a total price of $36,000.  FX 54 at EMPIRE0000178-179 (July 25, 2016 Shilling e-mail to Goren); FX 24 at EMPIRE0002528 (Pro forma invoice dated July 24, 2016).

Goren testified that he understood the initial $9,000 payment to be payment for "the tooling," that is, Fireclay's construction for Empire of the molds to be used to manufacture the sinks. Fireclay disputes this.  Wood testified that the $9,000 deposit was in no way a payment for the molds but rather that it was simply a deposit for the first set of sinks to be manufactured.  By contrast, Goren said that he understood that

4

placing an order and sending Fireclay a deposit would cover the cost of the molds; he stated that it is customary in the sink production industry for payments of this type to include the molds made to manufacture the sinks. Fireclay's counsel questioned Goren about the fact that the letter of intent (the purchase order) that Empire sent to Fireclay did not make any reference to molds, but Goren testified that Empire had already been working with Fireclay for about five months before Empire sent that document in January 2017. The Court will return to this aspect of the parties' dispute in a few moments.

Goren provided Fireclay with a design and specifications including size, depth, wall thickness, curves, and a decorative front panel. As the parties finalized their arrangement, Goren advised Wood that he needed assurances that Fireclay would not produce sinks for others to be sold in the United States. In response, Wood offered Goren two options: to "supply exclusively products to your designs to your company only," with Fireclay retaining the ability to sell sinks with different designs to other customers, or a more complex arrangement under which Empire would agree to take seventy percent of Fireclay's capacity. Goren testified, credibly, that he agreed to the first option. In sum, Empire and Fireclay agreed that Fireclay would supply sinks based on Empire's design exclusively to Empire. Fireclay created molds based on Empire's design that were necessary to produce the sinks: an initial block mold, which consists of six individual pieces; case molds, which are created from the block mold; and production molds, which are derived from the case molds and are used to manufacture the sinks.

The parties dispute the extent of any agreement regarding exclusivity. Wood and

Shilling testified that Fireclay offered exclusivity only regarding production of sinks for the US market with Empire's decorative front panel design and that there was no understanding about not selling "similar" designs to others. *See also* PX 24 at EMPIRE0000175 (e-mail exchange regarding sink front panel design). Empire contends, and Goren testified, that the understanding regarding exclusivity concerned the entire design of the sinks, as well as use and ownership of the molds made by Fireclay to produce the sinks. Fireclay contends, and its representatives testified, that it did not grant Empire ownership or exclusive rights to the molds.

### 2. Fireclay does business with Winslyn

In June 2017, Winslyn, an Empire competitor, corresponded with Fireclay, and the two entities entered into an agreement for Fireclay to manufacture sinks for purchase by Winslyn. Bill Stuebner, Winslyn's president, wanted to purchase the same "Olde London" model that Fireclay was producing for Empire. Wood attempted to persuade Stuebner to purchase an alternative sink, referencing an "owner ship issue" with the Olde London molds, "as the customer has paid for the mould," and stating that "[t]here are design rights" regarding the sinks Winslyn wanted. PX 10 at WINSLYN00000896-97.

Stuebner insisted that Wood sell Winslyn the Olde London model. Wood explained that he could not sell Winslyn the Olde London sink because he "had to agree we would only sell [Empire] that product" and because Fireclay had "taken a live order for the existing mould" and had told Empire it "can have the existing mold." PX 11 at WINSLYN00000905. Wood further stated that "I had to agree we would only sell them [Empire] that product." *Id.* He proposed to produce sinks for Winslyn that were slightly

6

different and said that the differences would be so slight that no one other than someone experienced in the trade would be able to tell the difference. *Id.*

Wood's communications to Winslyn are important evidence regarding the terms of the Empire-Fireclay agreement. During the evidentiary hearing, Wood essentially disavowed what he told Winslyn. He claimed that the above-referenced representations to Winslyn were, essentially, false statements made to keep a potential customer (Winslyn) on the hook while pushing it toward a different sink design.

### 3. Goren visits Fireclay's factory and places an order for sinks

In November 2017, during a visit to Fireclay's factory in the UAE, Goren discovered that Fireclay had created sink models with slight variations from Empire's design for another customer—which turned out to be Winslyn. Goren testified credibly during the evidentiary hearing that Fireclay had done this using the molds made to produce sinks for Empire; he urged Fireclay representatives to stop; and Fireclay agreed to do so.

In December 2017, Goren had a number of heated and somewhat intemperate e-mail communications with Fireclay in which he threatened legal action. Later that same month, Wood terminated Empire's relationship with Fireclay. In doing so, Wood "confirm[ed] that we do not have any moulds to manufacture the sink designs we have worked on together." PX 19 at EMPIRE0002070. Goren quite understandably understood this to mean that Fireclay no longer had the case molds, the block molds, or production molds based on Empire's design. Timy Samuel, the plant manager at the Fireclay factory, testified during the evidentiary hearing that it is the responsibility of Fireclay's managing director, Shilling, to discard or destroy molds that are no longer in

7

use.

In the response brief it filed on September 10, 2020 and during the evidentiary hearing, Fireclay contended that it is no longer using copies of Empire's molds to produce sinks for any other customers and that it "never used" the specific production molds that it "used to manufacture sinks sold to [Empire] . . . to manufacture sinks for any other customer."  Fireclay Resp. Mem. at 12 (dkt. no. 388).  Gerard Barron, a quantity surveyor[1] who inspected the Empire case molds still in Fireclay's possession during a July 2020 walk-through of its factory, testified that the case molds labeled as Empire's had deteriorated and that in his opinion they had not been used for a considerable length of time.  Id. at 13.  Shilling similarly testified that Fireclay has not used any of the molds it created and used to produce sinks for Empire—or copies of those molds—to produce sinks for any other customer.

Stuebner testified that after the Court entered the preliminary injunction against Winslyn in June 2018, Winslyn only bought Fireclay sinks based on a plain four-sided design that was distinct from Empire's design.  Winslyn sold the plain sinks to Menard's, a major U.S. retailer.  Stuebner stated that he understood from Fireclay that another entity had the rights to the design and molds for the sink he originally requested (i.e. Empire's design).

Empire introduced testimony from Richard Klopp, an engineering expert, who testified that based on an analysis of a Fireclay-manufactured sink he purchased from Menard's in July 2020, Fireclay used to produce that sink the same molds that it used to

---

[1] A quantity surveyor is a construction industry professional who conducts assessments on construction projects and resolves issues related to construction disputes, variations, delays, and related duties.

8

produce Empire's sinks. Klopp conducted a dimensional analysis (a comparison of the measurements and features of the sinks) and developed detailed computerized graphics showing comparisons of the sinks based on Empire's design—Olde London 1 and Olde London 2—to the Tuscany sink, a Fireclay-produced sink sold at Menard's. Klopp concluded, based on an imprint on the bottom of the sink, that the Tuscany sink from Menard's that he inspected was created by Fireclay in July 2019. Klopp further concluded that there was no reasonable way for Fireclay to produce the Tuscany sink without the Empire molds. Aside from the distinctive front panel, Klopp determined—based on the dimensional analysis—that the Tuscany sink produced by Fireclay was otherwise indistinguishable from the Empire Olde London models.

**Discussion**

Empire has moved for a preliminary injunction. "To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). "If a plaintiff makes such a showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.*

Empire contends that it entered into a binding and enforceable contract with Fireclay to produce sinks based on Empire's design exclusively for Empire. Under the agreement, Empire says, Fireclay used Empire's designs to create unique sink molds and produce custom sinks for Empire to sell the United States. Empire contends that

9

under the parties' arrangement, it acquired the rights to those molds. According to Empire, Fireclay has used and is using those same molds—or indistinguishable copies of them—to produce sinks based on Empire's design for other customers, in violation of the parties' agreement. Empire advised the Court that it seeks a preliminary injunction directing Fireclay: (1) to cease and desist using the molds made to produce sinks for Empire; (2) to cease and desist using any molds derived from the molds made to produce the Empire sinks; and (3) to destroy any existing molds covered by points (1) and (2).

In response, Fireclay contends, first, it never entered into any enforceable contractual agreement with Empire but rather that its only agreement was with Your Global Warehouse, an entity owned by Goren that operates as Empire's import agent, which placed the sink orders with Fireclay. It also disputes Empire's contentions regarding the nature and scope of any understanding regarding exclusivity. Fireclay further contends that it did not give Empire any rights to the molds. Fireclay also denies, however, using the molds that it made to produce the Empire sinks to create sinks for other customers.

At the hearing, Fireclay asked the Court not only to deny Empire's motion but also to dissolve the existing preliminary injunction that Empire obtained against Winslyn. *See* Modified Prelim. Inj. Order. The Court overrules this request. No motion to dissolve has been made in the nearly three years since the Court issued the preliminary injunction against Winslyn. In any event, there is no basis to dissolve the injunction, because it was properly supported by findings involving, among other things, Winslyn's interference in the exclusivity deal between Empire and Fireclay, none of which are

undermined by credible evidence presented at the hearing on the current motion. The Court will therefore confine its discussion to the current motion by Empire seeking a preliminary injunction against Fireclay.

### A.     Likelihood of success

"[A] mere possibility of success [on the merits] is not enough" for Empire to establish that it is likely to succeed on the merits. *See Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). Rather, Empire must show that "its claim has some likelihood of success on the merits," *Mays*, 974 F.3d at 822 (citation omitted).

The first question involves the applicable law. At the evidentiary hearing, Fireclay contended the contract law of the UAE applies. But in the written filings before the hearing, Fireclay made this assertion merely in a footnote, in a perfunctory and unsupported way. *See* Fireclay Resp. Mem. at 23 n.14. And it has offered no evidence or discussion of what UAE contract law is or how it applies. Fireclay has forfeited the point. "A party forfeits an argument . . . by raising it in a perfunctory or general manner." *United States v. Sheth*, 924 F.3d 425, 435 (7th Cir. 2019).

To determine the applicable substantive law, a federal court sitting in diversity typically looks to the conflict-of-laws rules in the state jurisdiction in which it sits. *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995). Under Illinois choice of law rules, the law of the state with the most significant contacts to the dispute governs. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 164, 879 N.E.2d 893, 903 (2007). In a breach of contract case, a court considers "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence,

11

nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188.

Empire asserts that New Jersey law applies to the breach of contract claim, based on its status as a New Jersey-based entity. *See Empire II*, 2021 WL 214639, at *2. Fireclay has not presented a viable argument to the contrary. *See id.* The alleged contract involving the parties is not based on a formal written agreement but rather on the parties' communications that reflect their understandings. Accordingly, factors (a) through (d) from the Second Restatement do not point to any particular jurisdiction as having more significant contacts. Thus based on factor (e), the parties' domiciles (New Jersey and the UAE), the Court agrees with Empire's assertion that New Jersey law governs Empire's breach of contract claim.

The parties also dispute whether the Uniform Commercial Code is applicable to the contract dispute. During the hearing, Empire characterized the contract between itself and Fireclay as a service agreement, which would fall outside of the UCC's scope. Fireclay argues that if there is a binding agreement between the parties, then it is an agreement for the sale of goods, which is covered by the UCC. *Quality Guaranteed Roofing, Inc. v. Hoffman-La Roche, Inc.*, 302 N.J. Super. 163, 166, 694 A.2d 1077, 1079 (1997) (explaining that the UCC "applies to transactions in goods") (internal quotations omitted). Fireclay also argued that because the UCC requires the agreement to be signed by the parties, the Court should conclude that there is no enforceable contract because there is no signed agreement.

The agreement between Empire and Fireclay involved a mixture of goods and services. Fireclay agreed to sell Empire custom sinks, which are goods under the UCC.

But it also agreed to provide a service: creating molds to be used to produce sinks based on Empire's designs. Under New Jersey law, "the UCC is applicable if the sales aspect predominates" but it is "inapplicable if the service aspect predominates." *Quality Guaranteed Roofing, Inc.*, 302 N.J. at 166, 694 A.2d at 1079 (internal quotation marks and citations omitted). "Whether the goods aspect or the services aspect predominate in a mixed contract is a question of fact." *Id.* In this case, the agreement resulting from the parties' business relationship was dependent on Fireclay's ability to create custom sinks, based on Empire's designs, through its unique product manufacturing process. Though the fireclay sink products and the sink manufacturing service "were inextricably linked to one another," the "dominant purpose" of the contract was to make use of Fireclay's ability to manufacture custom sinks based on Empire's unique designs. *Id.* Accordingly, under New Jersey law, the UCC does not govern Empire's claim.

Under New Jersey law, "[a] cause of action exists for breach of contract when the plaintiff can demonstrate that there exists a valid contract, defective performance by the defendant, and resulting damages." *Zelnick v. Morristown-Beard School*, 445 N.J. Super. 250, 260, 137 A.3d 560, 566 (2015) (alterations accepted; quotation marks omitted). "In addition to the express terms of a contract, terms may be implied in fact and enforceable by interpretation of a promisor's word [sic] and conduct in light of the surrounding circumstances." *Id.* (alterations accepted; internal quotation marks omitted). Fireclay asserts that the contract is unenforceable in the absence of a formal, written document memorializing the party's terms. The Court disagrees. Under New Jersey law, "[t]he basic features of a contract are offer, acceptance, consideration, and performance by both parties." *Goldfarb v. Solimine*, --- A.3d ---, 2021 WL 626991, at *8

13

(N.J. Feb. 18, 2021). Moreover, "contracts do not need to be in writing to be enforceable." *Leodori v. Cigna Corp.*, 175 N.J. 293, 304-05, 814 A.2d 1098, 1106 (2003); *see also Skuse v. Pfizer, Inc.*, 244 N.J. 30, 54, 236 A.3d 939, 953 (N.J. 2020) ("no principle of New Jersey contract law bars enforcement of a contract because that contract is communicated by e-mail"); *see also Empire I*, 327 F. Supp. 3d at 1111-12 ("an enforceable contract can exist without being signed or written; this is not a reason for concluding no contract exists").

Empire has established a reasonable likelihood of success on its breach of contract claim against Fireclay. Specifically, the evidence tends to support Empire's contention that Fireclay agreed to produce sinks based on Empire's design exclusively for Empire. This is shown by, among other things, the "option 1" proposal by Fireclay, which the credible evidence shows Empire accepted, and Wood's representations to Winslyn regarding the nature of the Fireclay-Empire agreement. The credible evidence also supports Empire's contention that its agreement with Fireclay included rights to the molds made by Fireclay to produce the Empire-designed sinks. The evidence supports Empire's contention that the $9,000 deposit it made included payment for rights to the molds. Empire has also shown a reasonable likelihood that Fireclay breached the parties' agreement by selling to other customers, in particular Winslyn, sinks produced from the molds that were made to produce Empire's designs.

Fireclay, based on testimony by Shilling and Wood, contended that the correspondence between Goren and Shilling concerned only the design for the decorative front panel. Fireclay contended at the hearing that if there was an agreement regarding exclusivity, its only obligation was to sell just to Empire sinks with

14

the Empire-designed front panel; that there was no exclusivity regarding the sink as a whole; and that Empire did not acquire rights to the molds. This argument does not hold water. Wood expressly represented to Winslyn that Fireclay could not sell Winslyn the sinks it wanted (the Olde London model) because "[t]here are design rights on the existing [sink model]" and "there is a [sic] owner ship issue now as the customer has made for the mould." PX 10 at WINSLYN00000896-97. These and the other representations by Wood were direct admissions that Empire had exclusive rights to this sink model *and* ownership of the molds. As indicated, Wood claimed during his testimony that he did not really mean what he said and that his statements were only made to dissuade Stuebner from purchasing the Olde London sink and persuade him to buy a different product. That testimony was utterly lacking in credibility. Wood's contemporaneous representations to Winslyn, which the Court finds were not made as a business tactic or a diversion or in any way other than sincerely, reflect Fireclay's understanding that Empire had rights to the sink design *and* the molds made to produce the design. Wood's admissions and the other evidence presented establish a reasonable likelihood that Empire will succeed in showing that the agreement between Fireclay and Empire included an understanding about how the molds could be used.

Fireclay argues that there is no e-mail exchange *with Goren* that affirmatively demonstrates that Empire acquired rights to the molds. The short answer to this is that it is not necessary; a contract may be formed by orally, not just in writing. "[P]arties may orally, by informal memorandum, or by both agree upon all the essential terms of a contract and effectively bind themselves thereon, if that is their intention." *Comerata v. Chaumont, Inc.*, 52 N.J. Super. 299, 305, 145 A.2d 471, 475 (1958); *see also Esteves v.*

*Cabaca*, No. A-1847-16T3, 2018 WL 2166073, at *2 (N.J. Super. Ct. App. Div. May 11, 2018) ("An oral contract requires a meeting of the minds, offer and acceptance, consideration, and sufficiently defined terms."). The significance of Wood's e-mail is that it tends to establish what Fireclay understood at the time, which is consistent with Goren's testimony regarding the parties' mutual understanding. In short, the Court concludes that Empire has shown a likelihood of success on its contention that its agreement with Fireclay included rights to the molds.

The testimony of Empire's expert Klopp, which the Court found to be properly supported and credible on this point, is sufficient to establish that Fireclay breached the agreement by using the molds it made for Empire to produce sinks for others, including Winslyn. The testimony of Fireclay's expert Barron does not refute Klopp's testimony on this specific point, at least for purposes of the present motion. Barron's testimony was focused on the current state of affairs, not on Fireclay's historical use of the molds.

In sum, Empire has demonstrated that it has a reasonable likelihood of success on its breach of contract claim against Fireclay.

**B.      Irreparable harm and the inadequacy of legal remedies**

Empire must next demonstrate that "it will suffer irreparable harm in the interim period prior to final resolution of its claim[]" and that "traditional legal remedies would be inadequate" without an injunction barring Fireclay's use of the Empire design-based sink molds. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). This is, of course, a distinct question from whether Empire has shown a *past* breach by Fireclay.

During the evidentiary hearing, Fireclay presented evidence—in part through

16

expert testimony—tending to show that it is no longer using the sink molds based on Empire's design. This is where the testimony of Barron, Fireclay's expert, is significant. Barron testified that he visited the factory on July 22, 2020. During that visit, he inspected the sinks Fireclay had on its current production line as well as the molds in its possession. Although Fireclay appeared to still possess the Empire molds, Barron opined during his testimony that the molds had not been used for some considerable time because they had deteriorated and were damaged. The Court found that testimony properly supported and credible.

Empire did not offer any significant meaningful evidence to undercut this testimony by Barron, nor did it show affirmatively that Fireclay is using or has recently used the Empire molds. Empire did show, via Samuel's testimony, that Fireclay should have destroyed the Empire molds if they were no longer in use. But evidence that the molds still exist is not the same as evidence that they are or must be still in use. Klopp's testimony about the Tuscany sink he saw and purchased at Menard's in July 2020 reflects that the sink was (based on its imprint) made one year earlier, in July 2019. And Klopp's testimony and analysis did not otherwise establish that Fireclay is currently or has recently used the Empire-design-based molds to produce sinks for other customers. In short, there is no evidence indicating that any remaining molds are still usable at this point, let alone that they are being sued.

In sum, Fireclay's evidence persuasively indicates that it is not currently using Empire's molds to produce sinks based on Empire's design and has not done so recently. Given the absence of a showing of current or recent use, Empire has not established that it would suffer irreparable harm without the injunction it seeks or that

traditional contract-based remedies—i.e., an award of damages—would be inadequate to address Fireclay's past breaches.

For this reason, Empire has failed to make a threshold showing of elements that it must show to obtain a preliminary injunction.

### Conclusion

For the foregoing reasons, the Court denies Empire's motion for a preliminary injunction against Fireclay [dkt. no. 316]. The case is set for a telephonic status hearing on April 2, 2021 at 9:45 a.m., using call-in number 888-684-8852, conference code 746-1053. Counsel should wait for the case to be called before announcing themselves. The parties are directed to promptly confer regarding a schedule for further proceedings and are to file a joint status report with a joint or separate proposals in this regard by 12:00 noon on April 1, 2021. At the status hearing, they are to be prepared to discuss the possibility of settlement as well as a referral to the designated magistrate judge for that purpose.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 29, 2021